UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

————————————

No. 01-40591

————————————

KEVIN LEE ZIMMERMAN,

Petitioner-Appellant,

v.

JANIE COCKRELL, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

—————————————————————————————

Appeal from the United States District Court for the
Eastern District of Texas
(95-CV-002)

—————————————————————————————

August 1, 2002

Before SMITH, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Petitioner Kevin Lee Zimmerman (Zimmerman), convicted of capital murder in Texas and

sentenced to death, requests from this Court a Certificate of Appealability (COA) pursuant to 28

U.S.C. § 2253(c)(2). Zimmerman raises the following arguments: defense counsel's alleged conflict

———————————————

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

of interest; the attorney's failure to investigate Zimmerman's mental health and the victim's background; the State's failure to disclose exculpatory evidence; admission of unadjudicated extraneous evidence (and lack of notice thereof); and inadequate jury instructions with respect to the special issues. Finding that Zimmerman has made a substantial showing of the denial of a constitutional right with respect to his claim of ineffective assistance based on counsel's failure to investigate whether he was competent to stand trial, we GRANT a COA. With respect to the remaining claims, we DENY a COA.

## I.    BACKGROUND

Zimmerman, George Weber, and Kay Gonzales, arrived at a Motel 6 in Beaumont on October 23, 1987.[1] While at the motel, they met the victim, Leslie Gilbert Hooks, who also was staying at the motel. After having some drinks, Hooks suggested that they go to the fair. After returning from the fair, all four people returned to Zimmerman's room. After a short time, Hooks and Kay Gonzales went to Hooks's motel room, where Hooks paid Gonzales to have sexual intercourse. Hooks and Gonzales returned to Zimmerman's room.

After some time, Gonzales went to the bathroom and heard a struggle ensuing in the nearby bedroom. In that room, Zimmerman and Weber, armed with knives, attacked Hooks. After the two men stabbed him 31 times, Zimmerman took Hooks's wallet and gave it to Weber. Zimmerman, Weber, and Gonzales left in their car to bring Zimmerman to a hospital. While the car broke down after only a short time, Zimmerman did finally reach the hospital, where he received treatment for a knife wound.

---

[1] The facts surrounding the offense are taken nearly verbatim from the opinion of the Texas Court of Criminal Appeals. *Zimmerman v. State,* 860 S.W.2d 89, 92-93 (Tex.Crim.App. 1993).

2

Zimmerman was subsequently arrested and placed in jail.   While in jail, he wrote numerous letters to Weber and to the district attorney.    At trial, the State introduced many pieces of correspondence Zimmerman had written and signed.   In one of these letters to the district attorney, he  wrote that:

> [Hooks] never stabbed me and we never got into a fight.   [Hooks] had 4 or 5 hundred do l[l]ars on him and we were drinking so I decided to kill him and take his f[—]ing money.   When we got back to the room [Hooks] did not leave because I took out my knife and opened it and started stabbing him an in the course of me stabbing him I accidentally got stab[b]ed in my arm. After he was dead and I robbed--I rolled him over took the money out of his front pocket and took his wallet.   I told George Weber that if he ever said any thing I would kill him, too an[d] we left.   The car broke down on the side of the road I made George flag somebody down to take me to the hospital and he did.   I through [sic] the knife in the ditch, kicked off my shoes and threw my wallet out.   I don't know how much money there was but it was not much because [Hooks] bought some jew[e]lry  for Kay at the fair but however much it was I gave it to George and told him to be cool and split, I would handle the rest.

The contents of this letter were corroborated by the testimony of Gonzales.   According to her, Zimmerman and Hooks were arguing about an incident that had occurred at the fair.   Suddenly, Zimmerman "picked up a knife and ... stabbed him [the decedent] in his shoulder."   Gonzales then went into the bathroom and came back out, only to see both Zimmerman and Weber stabbing the decedent, who was yelling "Don't kill me.   Please don't let me die.   Don't kill me.   Please don't let me die."  After Hooks stopped moving, Zimmerman "went to get . . .[the] wallet out of his pockets."

A Jefferson County, Texas jury found Zimmerman guilty of capital murder.   After the punishment phase of the trial, the jury affirmatively answered the special issues set forth in Article 37.071(b) of the Texas Code of Criminal Procedure and the trial court sentenced Zimmerman to death. The Texas Court of Criminal Appeals affirmed the conviction and sentence. *Zimmerman v.*

*State,* 860 S.W.2d 89 (Tex.Crim.App. 1993), and the Supreme Court remanded the case in light of *Johnson v. Texas,* 509 U.S. 350, 113 S.Ct. 2658 (1993). *Zimmerman v. Texas,* 510 U.S. 938, 114 S.Ct. 374 (1993). Upon remand, the Court of Criminal Appeals again affirmed the judgment of the trial court. *Zimmerman v. State*, 881 S.W.2d 360 (Tex.Crim.App. 1994). The Supreme Court denied Zimmerman's petition for writ of certiorari. *Zimmerman v. Texas,* 513 U.S. 1021, 115 S.Ct. 586 (1994).

Zimmerman subsequently filed a petition for writ of federal habeas corpus in district court that was dismissed without prejudice for failure to exhaust state remedies. Zimmerman filed a state habeas petition, and the state court held an evidentiary hearing with respect to the claim of ineffective assistance of counsel. The state court adopted the proposed findings of fact and conclusions of law submitted by the State and recommended denying relief. The Court of Criminal Appeals denied relief "[b]ased upon the trial court's findings and [its] own review."

Zimmerman then filed the instant petition, which the district court denied. The district court granted Zimmerman a COA with respect to three issues: cumulative error based on ineffective assistance of counsel; excusing a juror for cause; and improper prosecutorial argument. Zimmerman filed a brief before this Court on the merits of those issues. He also filed the instant motion for a COA. We have suspended briefing pending a ruling on the instant motion for COA.

## II. STANDARD OF REVIEW

Zimmerman filed the instant section 2254 application for habeas relief after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). His application is therefore subject to the AEDPA. *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 2068 (1997). Under the AEDPA, a petitioner must obtain a COA. 28 U.S.C. § 2253(c)(2). A COA will be

4

granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S.Ct. 3383, 3394 n.4 (1983) (citation and internal quotation marks omitted). Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination. *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997).

To determine whether a COA should be granted, we must be mindful of the deferential scheme set forth in the AEDPA. *Hill v. Johnson,* 210 F.3d 481, 484-85 (5th Cir. 2000). Pursuant to 28 U.S.C. § 2254(d), we defer to a state court's adjudication of petitioner's claims on the merits unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1519-20 (2000). A state court's decision constitutes an unreasonable application of clearly established federal law if it is objectively unreasonable. *Id.* at 1521. Additionally, pursuant to section 2254(e)(1), state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.

5

III.    ANALYSIS

A.    CONFLICT OF INTEREST

Zimmerman argues that his counsel had a conflict of interest in violation of the Sixth Amendment.   As a general rule, to prevail on a claim of ineffective assistance of counsel, a petitioner must show: (1) that his counsel's performance was deficient in that it fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 689-94, 104 S.Ct. 2052, 2065-67 (1984).  "In some cases, however, prejudice is presumed if the defendant shows that an actual conflict of interest adversely affected his lawyer's performance."  *Beets v. Scott,* 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc).

In the instant case, the parties agree that on April 5, 1988, Barlow was appointed to represent Zimmerman and, six days later, to represent his codefendant George Weber.  Barlow subsequently informed the court of the appearance of conflict and, on June 29, 1988, withdrew as counsel of record.  The court appointed other trial counsel for Zimmerman, whose trial did not begin until some two years later.  Barlow remained as the attorney of record for codefendant Weber until at least November 22, 1988.[2]   Represented at their separate trials by attorneys other than Barlow, Zimmerman and Weber were convicted of capital murder and murder, respectively.  Barlow was appointed to represent Zimmerman and Weber with respect to their direct appeals.

Zimmerman acknowledges, as he must, that counsel recognized the appearance (at least) of conflict and successfully moved to withdraw as trial counsel.  Nonetheless, he argues that this action was not sufficient.  Zimmerman contends that the trial court's failure to independently inquire into

---

[2] The state court record indicates that Barlow "will ask to be released due to conflict" on that date.

6

the potential conflict constitutes a Sixth Amendment violation.    Zimmerman complains that the district court "did not even make this analysis of the appointing court's duty to inquire . . . ." However, a review of his pleadings filed in federal district court demonstrates that Zimmerman failed to adequately apprise the court of this specific argument.[3] "We have repeatedly held that a contention not raised by a habeas petitioner in the district court cannot be considered for the first time on appeal from that court's denial of habeas relief." *Johnson v. Puckett*, 930 F.2d 445, 448 (5th Cir.1991).

Even if we were to reach this argument, we conclude that Zimmerman has not made a substantial showing of the denial of a constitutional right with respect to this particular claim. He argues that the trial court knew or reasonably should have known of counsel's potential conflict of interest. He states that both he and codefendant Weber were charged with the same crime and had antagonistic defenses. In his motion for COA, Zimmerman provides no indication that the trial court would have been aware of any conflict regarding the defenses two years prior to trial. Very recently, the Supreme Court made clear that multiple representation does not, in and of itself, trigger a trial court's duty to make inquiry with respect to potential conflict of interest. *Mickens v. Taylor,* __U.S. __, 122 S.Ct. 1237 (2002). The Supreme Court instructed that inquiry is required only when "the

---

[3] In his federal habeas petition, Zimmerman makes no reference to the state trial court's failure to  make any inquiry regarding potential conflict. The only possible reference we discern is in his reply to the State's motion for summary judgment. In that pleading,  in the context of arguing that he had shown an adverse effect on counsel's performance,  Zimmerman quoted the following language from a Fifth Circuit case: "trial courts can play an important role in situations inherently rife with conflict by ascertaining whether the defendant understands the consequences of the potential conflict and nonetheless wants to continue with the present lawyer." *Perillo v. Johnson,* 205 F.3d 775, 806 n. 13 (5th Cir. 2000). However, Zimmerman quoted that language in support of his argument that there are institutional reasons for requiring a lesser showing of prejudice in conflict of interest cases. Under these circumstances, we do not believe the district court was adequately apprised of the argument that the trial court failed to make an inquiry regarding counsel's potential conflict of interest.

7

trial court knows or reasonably should know that a particular conflict exists. . .--which is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict, such as that which inheres in almost every instance of multiple representation[.]" *Id.* at 1242 (internal quotation marks and citation omitted).

Zimmerman also argues that the district court erred in holding that both an actual conflict of interest and an adverse effect on counsel's performance must be shown.[4] We have stated that if no objection is made, a petitioner must show that "an actual conflict of interest adversely affected his lawyer's performance." *Beathard v. Johnson,* 177 F.3d 340, 346 (5th Cir. 1999) (citing *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708 (1980)). More specifically, Zimmerman contends that because he has shown an "actual" conflict of interest, he need not show that the attorney's performance was adversely affected by it. The Supreme Court recently rejected this argument. In

---

[4]     The district court denied the claim of conflict of interest, opining in part as follows:
If an attorney simultaneously represents conflicting interests, and because of the conflict some plausible defense strategy or tactic which might have been pursued was not, then the conflict "adversely affected the lawyer's performance" and relief must be granted, even in the absence of evidence that petitioner was prejudiced by the adverse performance. *Beathard v. Johnson*, 177 F.3d 340, 346 (5th Cir. 1999). Here, however, Barlow withdrew as counsel nearly two years before Zimmerman went to trial, and Barlow's inactivity was not responsible for Zimmerman's later counsel's failure to pursue any plausible defenses. For example, assuming *arguendo* that a diminished mental capacity defense was plausible, Barlow's inactivity during the time he represented both Zimmerman and Weber did not prevent Zimmerman's subsequently appointed attorneys from pursuing a diminished capacity defense. Zimmerman's allegations do not meet the requirements of *Beathard. Beathard* binds this court to find that the Texas Court of Criminal Appeals' decision denying this subclaim was not clearly contrary to, or an unreasonable application of, clearly established federal law, as declared by the United States Supreme Court in *Strickland.*

8

*Mickens,* the Court clarified language from its previous opinions and explained that "the [*Cuyler v. Sullivan]* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." 122 S.Ct. at 1244 n.5.

Thus, after *Mickens*, it is clear that Zimmerman must demonstrate that a conflict of interest affected the adequacy of counsel's performance. The determination of whether a conflict of interest exists is a mixed question of fact and law. *United States v. Barrientos,* 668 F.2d 838, 841 (5th Cir. 1982) (citing, *inter alia, Cuyler v. Sullivan*, 446 U.S. at 341-42, 100 S.Ct. at 1714-15). We review mixed questions of law and fact under the "contrary to" and "unreasonable application" prong of 28 U.S.C. § 2254(d). *See Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.2000).

The state habeas court ruled that no conflict of interest existed.[5] The federal district court found that "Barlow had a conflict of interest, because he represented Zimmerman's co-defendant Weber." We will assume for purposes of analyzing this issue that Barlow's representation of both Zimmerman and Weber prior to trial constituted a conflict of interest.

We must now reach the question of whether this conflict adversely affected counsel's performance. In support of his assertion of adverse effect, Zimmerman points to counsel's inaction during the nearly three months of representation. We have explained that "when a petitioner's claim is premised solely upon what a conflicted lawyer failed to do on his or her behalf, the petitioner must generally establish adverse effect by demonstrating that there was some plausible alternative defense

---

[5] The state habeas trial court found that Zimmerman had not "shown or pleaded facts showing an actual conflict. A review of the record shows that no actual conflict existed." The Texas Court of Criminal Appeals denied relief "[b]ased upon the trial court's findings and [its] own review."

strategy that could have been pursued, but was not, because of the . . . conflict." *Perillo*, 205 F.3d at 807. As the district court recognized, counsel withdrew almost two years prior to trial and Zimmerman has not shown that the inactivity was responsible for any failure on the part of trial counsel to pursue any plausible defenses. Zimmerman nevertheless argues that counsel's conflict and inaction during the period in question "were likely directly responsible for the frustrating delays experienced by Zimmerman, which led to the statements and letters which elevated the charges to capital murder." Zimmerman is referring to the letters he wrote to the district attorney admitting that he killed the victim for his money. At the time he wrote the letter, he had been indicted on the charge of murder. Subsequent to the letter, Zimmerman was indicted on the charge of capital murder. According to Zimmerman, this was the most important consequence of the conflict. We do not believe Zimmerman's own actions constitute prejudice because "the focus is upon whether the . . . conflict burdening counsel's performance had an actual and adverse effect *on counsel's performance*." *Perillo,* 205 F.3d at 806 (emphasis added). Thus, Zimmerman's actions are not the proper focus when determining whether there has been an adverse effect on counsel's performance. We conclude that Zimmerman has failed to demonstrate the requisite adverse effect and deny a COA as to Zimmerman's conflict of interest claim regarding counsel's representation prior to trial.

Finally, Zimmerman argues that the "more egregious instance of an actual conflict" occurred when Barlow was appointed as appellate counsel for both Zimmerman and Weber.[6] With respect to codefendant Weber's direct appeal in state court, counsel argued that Zimmerman coerced Weber's testimony at Zimmerman's trial. *Weber v. State,* 829 S.W.2d 394 (Tex.App.–Beaumont 1992). This

---

[6] We note that because Weber was convicted of the lesser offense of murder, his direct appeal was before the Court of Appeals in Beaumont, Texas, and Zimmerman's direct appeal was before the Court of Criminal Appeals.

10

prior testimony was admitted against Weber at his trial. We will assume that a conflict of interest existed on direct appeal and now turn to adverse effect.

Zimmerman contends that because counsel argued that Zimmerman coerced Weber's testimony, "[t]his prevented [counsel] from emphasizing the truth of Weber's testimony in Zimmerman's appeal for a claim of insufficiency of the evidence for a capital murder conviction." Zimmerman did not raise this argument in the conflict of interest section of his 222-page federal habeas petition. He did make this assertion (though not as fully) in a footnote in the factual background section. We have doubts whether this adequately apprised the district court of Zimmerman's argument. In any event, we will assume that the argument was sufficiently raised. Contrary to Zimmerman's assertions, counsel did rely upon Weber's testimony as Zimmerman's appellate counsel. On direct appeal, the Court of Criminal Appeals' opinion provides that Zimmerman "argues that Weber's testimony that the decedent started the altercation, that [Zimmerman] and Weber were acting in self defense and that there was no robbery, proves the evidence was insufficient to support the conviction." *Zimmerman v. State*, 860 S.W.2d 89, 93 (Tex.Crim.App. 1993) (footnote omitted). Under these circumstances, we do not believe that Zimmerman has shown an adverse effect on counsel's performance. We therefore deny Zimmerman's request for a COA.

B.    INEFFECTIVE ASSISTANCE

1.    Failure to investigate background of victim.

Zimmerman argues that trial counsel, Linda C. Cansler, rendered ineffective assistance by failing to investigate the background of the victim in order to support his claim of self defense. As set forth above, Zimmerman must show: (1) that his counsel's performance was deficient in that it

11

fell below an objective standard of reasonableness; and (2) a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 689-94, 104 S.Ct. at 2065-67.

Zimmerman asserts counsel should have discovered that the victim had a history of criminal violence, including battering at least two of his wives, and a pattern of violent aggression against strangers when drinking alcohol. Such evidence he argues would have served to support his theory of self defense. Even if we assume that counsel's failure to investigate the victim's tendency toward violence constituted deficient performance, Zimmerman has not shown *Strickland* prejudice. As the state court found, the victim received over thirty stab wounds (some inflicted upon the victim's back) compared to the one wound Zimmerman received. We agree with the district court's conclusion that evidence of the victim's past violence would have been "outweighed by the July 26, 1988 letter from Zimmerman to the district attorney," which provided as follows:

> I was gonna try to buck this Capit[a]l Murder charge on a self-defense issue, but because of the fact that I know I am a dangerous threat to myself and the free world, I'm going to tell the truth because I have to be stop[p]ed. Mr. Hooks never stabbed me and we never got into a fight. Mr. Hooks had 4 or 5 hundred dol[l]ars on him and we were drinking so I decided to kill him and take his f—ing money. I took out my knife and opened it and started stabbing him an[d] in the course of me stabbing [him] I accidentally got stab[b]ed in my arm. After he was dead and I robbed – I rolled him over took the money out of his front pocket and took his wallet . . .

We likewise agree with the district court's conclusion that because "Zimmerman's admissions in his letter were significantly more probative on this issue than the evidence of Hooks's propensity for violence . . . there is not a reasonable probability that, had the jury been presented with evidence of the victim's propensity for violence, the result in either the guilt-innocence phase or the punishment

12

phase of the trial." We therefore deny a COA with respect to this issue.

2. Failure to investigate Zimmerman's mental health.

Zimmerman argues that counsel rendered ineffective assistance by failing to investigate his mental health. He asserts evidence of his mental health problems should have been presented as mitigating evidence during the punishment phase of his trial.[7]

While riding his bicycle as a child, Zimmerman had an accident during which he hit his head on a culvert and lost consciousness. As a result of this accident, a metallic plate was inserted in his skull. Zimmerman argues that if counsel had interviewed his family, she would have learned that after the head injury he began to suffer "mental problems." Zimmerman admits that counsel interviewed his mother regarding his injury and that his mother testified at trial regarding the accident and the subsequent surgery. However, he argues that testimony should have been presented regarding the effect of the injury on his behavior. According to Zimmerman, "[p]rior to his bicycle injury, his behavior was normal and appropriate. It was only after the frontal lobe injury that he became violent."

Zimmerman faults counsel for failing to interview his father, Bobby Zimmerman. During the state habeas proceedings, counsel explained that she did leave messages for Zimmerman's father, but

---

[7] Zimmerman's motion for COA contains a section entitled: "**Failure To Present the Mental Health Evidence In Conjunction with the Self-Defense Evidence.**" In that section he asserts that "as shown above, trial counsel failed to develop information that would have been directly relevant to Zimmerman's mental state and to both phases of the trial." However, Zimmerman does not specifically indicate how the evidence would have supported a theory of self defense at the guilt-innocence phase. Indeed, the principal argument contained within this section refers to Zimmerman obtaining a life sentence instead of a death sentence. Even assuming that he properly briefed the issue regarding the guilt-innocence phase in his COA, we do not believe he can show prejudice. As previously set forth, the victim received over thirty stab wounds compared to the one wound Zimmerman received. Moreover, Zimmerman admitted that he killed the victim for the money and that the victim did not start the fight.

13

he never returned her call. He also faults counsel for failing to interview his aunt, Jonell Smith, regarding his mental health after the accident. His aunt noticed "subtle changes from when the plate was placed in his head." His aunt also knew that Zimmerman had an abnormal EEG as a child but counsel failed to obtain his records.

Once again, we will assume *arguendo* that counsel rendered deficient performance by failing to investigate evidence regarding Zimmerman's mental health problems subsequent to his head injury. Zimmerman argues that the quality of this mitigating evidence is such that had it been presented to the jury, there is a reasonable probability of a different outcome. As previously indicated, counsel did introduce to the jury evidence of Zimmerman's head injury and the subsequent surgery in which a metallic plate was positioned in his skull. The jury did not learn of his violent tendencies that appeared after the injury. As the district court recognized, this evidence constitutes the classic double-edged sword.[8] More specifically, this evidence "mitigated his culpability and at the same time it indicated that he would be dangerous in the future." *Lackey v. Scott,* 28 F.3d 486, 488 (5th Cir. 1994). Furt her, in light of Zimmerman's admission in the letter to the district attorney that he decided to kill the victim to take the cash, the mitigating value of this evidence would have been diminished. Under these circumstances, we conclude that Zimmerman has not shown that, had this evidence been before the jury, there is a reasonable probability of a different outcome. *See Callins v. Collins*, 998 F.2d 269, 278 (5th Cir. 1993) (rejecting ineffective assistance of counsel claim based on failure to investigate mitigating evidence because the evidence "cuts both ways" did not establish

---

[8] Before the district court, Zimmerman also contended that counsel should have offered the following testimony of Dr. Alan Childs: "Zimmerman is not and was not a violent predator who planned any act of violence, but rather he was given to brief explosive rages during which both behavioral control and memory function were grossly disturbed." He does not reurge this contention in his motion for a COA.

14

prejudice). We deny a COA as to this issue.

### 3. Failure to evaluate Zimmerman's competency.

Zimmerman also contends that counsel rendered ineffective assistance by failing to have him evaluated for competency to stand trial. It is well established that "[d]ue process prohibits the conviction of a person who is mentally incompetent." *Bouchillon v. Collins,* 907 F.2d 589, 592 (5th Cir. 1990) (footnote and citation omitted). The test for determining competency is whether, at the time of trial, the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* (citations and internal quotation marks omitted). To prevail on an ineffective assistance claim based on counsel's failure to obtain a competency evaluation, the petitioner must demonstrate a reasonable probability that he was incompetent to stand trial. *Id.* at 595.

Zimmerman argues that counsel was aware that "something was not quite right about Zimmerman." In support of his assertion that counsel should have obtained a competency evaluation, Zimmerman relies on the results of an Minnesota Multiphasic Personality Inventory-2 (MMPI) evaluation completed three weeks prior to trial and letters he wrote to the trial court and the prosecutor containing threats and a demand to be charged with capital murder.[9] As set forth by the district court, the MMPI-2 profile provided as follows:

> Although the profile is probably valid, it may reflect some

---

[9] In a footnote, Zimmerman asserts that he had written letters to his first lawyer indicating that he wanted a competency examination. He does not provide a record cite. The State responds that Zimmerman "has never once provided copies of any of these alleged letters for any court to review to determine the actual nature of his 'competency request.'" The district court provides that the record contains three such letters.

15

> exaggeration of symptoms. The client appears to be quite confused and disorganized, and is experiencing severe personality deterioration. His MMPI-2 profile also reflects an active florid psychotic process, which includes a loss of contact with reality, inappropriate effect, and erratic, possibly assaultive behavior . . . . In an interview, he is likely to be circumstantial, tangential, and disorganized. *It is unlikely that he could contribute to his own defense at a legal hearing, since his behavior is inappropriate and his thoughts are illogical.*[10]

(emphasis added).

The results indicating that it was unlikely Zimmerman could contribute to his defense render the question of deficient performance, under the standard for granting a COA, adequate to deserve encouragement further. *Cf. Bouchillon*, 907 F.2d at 597 (explaining that counsel's lack of investigation after notice of past institutionalization constituted deficient performance).

As previously indicated, to meet the prejudice prong of *Strickland* and prevail on the merits, Zimmerman must show that had counsel investigated his competence to stand trial, "there was a reasonable probability that he was in fact incompetent." *Theriot v. Whitley*, 18 F.3d 311, 314 (5th Cir. 1994). A reasonable probability is a lesser burden of proof than the preponderance standard. *Bouchillon*, 907 F.2d at 595. Although the MMPI results, "suicidal" letters, and head injury may not ultimately demonstrate a reasonable probability that he was incompetent to stand trial, we believe Zimmerman has demonstrated that this question is "adequate to deserve encouragement further." *Barefoot*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4 (citation and internal quotation marks omitted). We therefore grant a COA with respect to this claim.

    C.    *BRADY* CLAIM

Zimmerman next argues that the State failed to disclose exculpatory evidence in violation of

---

[10] The State asserts that the MMPI results are not included in the record on appeal but does not dispute the contents. The district court quoted the results in part.

*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). The State has a duty to disclose evidence favorable to the accused that is material to guilt or punishment. *See Brady v. Maryland,* 373 U.S. at 86-87, 83 S.Ct. at 1195-96. To establish this due process violation, an accused must show that the State withheld evidence, that the evidence was favorable, and that the evidence was material to the defense. *Little v. Johnson*, 162 F.3d 855, 861 (5th Cir. 1998). In assessing *Brady* materiality "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 1566 (1995). "A 'reasonable probability' of a different result is accordingly shown when the [State's] evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.*

Zimmerman first complains of evidence with respect to the victim's background. Specifically, he asserts that the State failed to disclose the victim's prior conviction for simple battery, evidence of the victim's wife-beating, and his tendency toward violence when drinking alcohol.

In support of this claim, he relies on an affidavit executed by the victim's wife, Janet Hooks, which provides that she "believe[s]" she informed the detective handling the instant murder case "about Gilbert beating me in Louisiana . . . ."[11] Zimmerman also asserts that the victim's wife had a restraining order against him.

The standard for materiality under *Brady* is "identical to" the standard for prejudice under *Strickland*. *Johnson v. Scott*, 68 F.3d 106, 109-10 (5th Cir.1995). Because failure to investigate and present evidence of the victim's violent past was not prejudicial under *Strickland* as discussed

---

[11] We note that the victim's wife "believe[s]" she told the detective that the victim beat her. It appears she was not certain. In any event, we will assume for purposes of this appeal that she did so inform the detective.

17

above, it is not material under *Brady.*

Zimmerman also complains that the State withheld from the defense the cab driver's statements with respect to whether the victim, Hooks, had cash the night of the murder. He relies upon the cab driver's affidavit obtained by the police prior to trial. In the affidavit, the driver stated that Hooks was very intoxicated. The affidavit further provided that after the cab driver informed the group the charge was four dollars, Hooks and the woman both "acted like they were going to pay" but instead Zimmerman paid him.

Zimmerman contends that this evidence indicates that the victim had no money, thus negating the robbery element of the capital crime. Initially, we note that although Hooks did not pay the driver, the driver did not state that Hooks had no money but rather that Zimmerman actually paid. Further, in his motion, Zimmerman acknowledges that, after the cab ride, Hooks paid Gonzales twenty dollars he retrieved from his front pocket. Most telling, in Zimmerman's letter he admitted that he knew that "Hooks had four or five hundred dollars on him." Under these circumstances, we do not believe that Zimmerman has shown that the cab driver's statement was material to the defense.

We conclude that Zimmerman has not made a substantial showing of the denial of a constitutional right. Thus, he is not entitled to a COA with respect to his *Brady* claim.

F.      ADMISSION OF UNADJUDICATED OR EXTRANEOUS CONDUCT

Zimmerman contends that his due process rights were violated by the admission of (and lack of notice of) unadjudicated extraneous evidence. He challenges the admission of allegations of prior criminal misconduct and testimony from a police officer that amounted to "propensity for violence" evidence. The state habeas court held that the claim was procedurally barred because there was no

18

objection at the time the evidence was offered. In denying federal habeas relief, the district court likewise found that the claim was procedurally barred.

Zimmerman challenged the procedural bar in the district court but fails to do so in his motion for COA, thereby abandoning this challenge. *Hobbs v. Blackburn*, 752 F.2d 1079, 1082 (5th Cir. 1985). Even if we reached this issue, it would afford Zimmerman no relief. Our review of a district court's determination of a procedural bar is *de novo. Johnson v. Cain,* 215 F.3d 489, 494 (5th Cir. 2000). The state habeas court expressly found the claim procedurally barred for failure to object to the evidence, and this Court has "held that the Texas contemporaneous objection rule is strictly or regularly applied evenhandedly to the vast majority of similar claims, and is therefore an adequate procedural bar." *Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998). The district court therefore properly found the claim procedurally barred.

Moreover, we have held that challenges to the admission of unadjudicated extraneous offenses during the punishment phase based on the Eighth Amendment, due process, and equal protection are barred by *Teague v. Lane,* 489 U.S. 288, 301, 109 S.Ct. 1060 (1989). *See also Gray v. Netherland,* 518 U.S. 152, 116 S.Ct. 2074, 2083-84 (1996) (holding that petitioner's due process claim based on lack of notice of evidence of unadjudicated offenses at the punishment phase would require the adoption of a new rule). Zimmerman is not entitled to a COA with respect to this issue.

G.      INADEQUATE JURY INSTRUCTIONS AT SENTENCING

Zimmerman argues that the jury was given inadequate instructions at the penalty phase of his trial. More specifically, Zimmerman argues that the trial court's refusal to define the term "deliberately" in the first special issue, along with the "Texas Court of Criminal Appeals' long-standing refusal to impose any limiting construction[,] created an arbitrary sentencing procedure" that

19

failed to rationally channel the sentencer's discretion. However, we have repeatedly rejected the argument that the failure to define the terms in the first two special issues (including "deliberately") renders the instructions impermissibly vague. *Woods v. Johnson*, 75 F.3d 1017, 1034 (5th Cir. 1996) (citing *Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir.1984); *Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir. 1987); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993)).

Nonetheless, Zimmerman asserts that the Supreme Court's recent analysis in *Penry v. Johnson,* 121 S.Ct. 1910 (2001) ("*Penry II*") "has significance for this claim." We find *Penry II* inapposite to the case at bar.

The claim in *Penry II* was that the punishment phase instructions "did not provide the jury with a vehicle for expressing its reasoned moral response to the mitigating evidence of Penry's mental retardation and childhood abuse." 121 S.Ct. at 1920. The Supreme Court observed that its prior opinion in *Penry I*[12] provided guidance with respect to rectifying the error in the jury instructions. 121 S.Ct. at 1923. Specifically, the Court explained that "our concerns would have been alleviated by a jury instruction defining the term 'deliberately' in the first special issue 'in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability.'" *Id.* (quoting *Penry I,* 492 U.S. at 323, 109 S.Ct. 2934). As such, Penry's claim was based upon the Supreme Court's command that the sentencer must be permitted to consider and give effect to any constitutionally relevant mitigating evidence.[13]

---

[12] *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934 (1989).

[13] *E.g., Eddings v. Oklahoma*, 455 U.S. 104, 113-114, 102 S.Ct. 869, 876-877 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965 (1978).

20

In contrast, Zimmerman's argument involves another command found in the Supreme Court's eighth amendment jurisprudence, *i.e.,* a sentencer's discretion to impose death must be properly directed and limited so as to minimize the risk of arbitrary and capricious action. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 187-89, 96 S.Ct. 2909, 2931-32 (1976) (opinion of Justices Stewart, POWELL, and STEVENS, JJ.); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726 (1972) (per curiam).

Accordingly, *Penry II* does not apply to Zimmerman's claim, and we are bound by our previous decisions rejecting the claim that the failure to define terms in the special issues renders the instructions impermissibly vague. Zimmerman is not entitled to a COA with respect to this claim.

We GRANT Zimmerman's request for a COA only with respect to his claim of ineffective assistance based on counsel's failure to investigate whether he was competent to stand trial. We DENY a COA with respect to the remaining claims.

The suspension of briefing is lifted and the Clerk is directed to issue a new briefing schedule to allow Zimmerman to file a brief with respect to the claim of ineffective assistance based on counsel's failure to investigate whether he was competent to stand trial and to allow the Director to respond to that claim and to respond to the claims that the district court granted a COA.